IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CINDY G. GAFFNEY,                          )
                                           )
                        Plaintiff,         )
                                           )
            v.                             )        1:16CV808
                                           )
NANCY A. BERRYHILL,[1]                     )
Acting Commissioner of Social Security,    )
                                           )
                        Defendant.         )


<u>MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Cindy Gaffney ("Plaintiff") brought this action pursuant to Section 205(g) of

the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review

of a final decision of the Commissioner of Social Security denying her claim for Disability

Insurance Benefits ("DIB") under Title II of the Act.  The parties have filed cross-motions

for judgment, and the administrative record has been certified to the Court for review.

I.      <u>PROCEDURAL HISTORY</u>

Plaintiff protectively filed her application for DIB on July 27, 2012, alleging a disability

onset date of June 18, 2010, later amended to July 15, 2012.  (Tr. at 13, 150-51.)[2]  Her claim

was denied initially (Tr. at 57-70, 89-97), and that determination was upheld on reconsideration

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017.  Pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W.
Colvin as the Defendant in this suit.  No further action need be taken to continue this suit by reason of the last
sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Record [Doc. #7].

(Tr. at 71-86, 99-106). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 107.) Plaintiff attended the subsequent hearing on August 19, 2014, along with her attorney and an impartial vocational expert. (Tr. at 13.)

The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 23-24.) On April 27, 2016, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

## II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be

"perform past relevant work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.

However, if the claimant establishes an inability to return to prior work, the analysis proceeds

to the fifth step, which "requires the Commissioner to prove that a significant number of jobs

exist which the claimant could perform, despite [the claimant's] impairments."  Hines, 453

F.3d at 563.  In making this determination, the ALJ must decide "whether the claimant is able

to perform other work considering both [the claimant's RFC] and [the claimant's] vocational

capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d

at 264-65.  If, at this step, the Government cannot carry its "evidentiary burden of proving

that [the claimant] remains able to work other jobs available in the community," the claimant

qualifies as disabled.  Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful

activity" since July 15, 2012, her amended alleged onset date.  Plaintiff therefore met her

burden at step one of the sequential evaluation process.  At step two, the ALJ further

determined that Plaintiff suffered from the following severe impairments:

> lumbar degenerative disc disease and facet joint arthritis; arthritis; cervical
> degenerative disc disease with bulging discs; obstructive sleep apnea; migraine
> headaches; major depressive disorder; and generalized anxiety disorder.

(Tr. at 15.)  The ALJ found at step three that none of these impairments, either individually or

in combination, met or equaled any disability listing.  (Tr. at 17-18.)  Therefore, the ALJ

---

determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any
related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

assessed Plaintiff's RFC and determined that she could perform light work with the following additional limitations:

> She must alternat[e] between sitting and standing at will throughout the workday without going off task. She can occasionally climb ramps or stairs. She can occasionally stoop, crouch, or kneel. She can never climb ladders, ropes, or scaffolds. She is limited to frequent handling and fingering, bilaterally. She must avoid concentrated exposure to moving machinery and working at unprotected heights. Due to her psychological symptoms, she can only interact with the public on an occasional basis. She can occasionally interact with coworkers, but not work in tandem with them. She can respond appropriately to supervision. She can perform simple, routine, and repetitive tasks. She can tolerate only occasional decision-making. She can tolerate only occasional changes in the work setting.

(Tr. at 19.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff remained capable of performing her past relevant work as an office worker. (Tr. at 22.) The ALJ also made an alternative finding at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in the national economy. (Tr. at 22-23.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 23-24.)

Plaintiff now contends that the ALJ's RFC assessment both (1) failed to give a complete function-by-function analysis as to Plaintiff's mental RFC as required by Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), and (2) failed to properly weigh the opinion evidence. Plaintiff further argues that with respect to steps four and five of the sequential analysis, the ALJ failed to resolve apparent conflicts between the vocational expert testimony and the Dictionary of Occupational Titles ("DOT"). After careful consideration, the Court finds that none of these contentions merit remand, as set out below.

A.      Mental RFC Determination

1.      Concentration, persistence, and pace

At step three of the sequential analysis, the ALJ determined that Plaintiff has moderate limitations in concentration, persistence, and pace.  In Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), the Fourth Circuit explained that where such limitations are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work.  The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638 (quotation omitted).  This is because "the ability to perform simple tasks differs from the ability to stay on task.  Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."  Id.  The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity.  For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert.  But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted).  However, as previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision. . . .

> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (finding that RFC limitations to "simple, routine, repetitive tasks with simple, short instructions, in a job that required making only simple, work-related decisions, involved few workplace changes, and required only frequent contact with supervisors, co-workers, or the public" sufficiently accounted for a Plaintiff's moderate limitations in concentration, persistence, or pace in light of the ALJ's explanation throughout the administrative decision) (quoting Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)).

In the present case, as noted above, the ALJ found at step three of the sequential analysis that Plaintiff had "moderate difficulties" with regard to concentration, persistence, or pace. The ALJ then explained that, although Plaintiff "has reported difficulties with memory and concentration . . . , [her] daily activities show that she retains sufficient concentration to perform simple tasks, in that she can prepare meals, do laundry, and manage a checkbook." (Tr. at 18.)

In setting the RFC, the ALJ then limited Plaintiff to "simple, routine, and repetitive tasks" with "only occasional decision-making" and "only occasional changes in the work setting." (Tr. at 19.) In making this assessment, the ALJ again referred to Plaintiff's activities of daily living, noting that she "shops at the grocery store once or twice per week" and "also cares for her twelve-year-old adopted daughter." (Tr. at 20.) In addition, the ALJ noted that in the third-party function report, Plaintiff's husband stated that Plaintiff "is competent to

handle financial matters, such as paying bills, counting change, managing a savings account, and using a checkbook." (Tr. at 21.) The ALJ also considered Plaintiff's mental health treatment record, and noted that the treatment records reflect that "her psychological symptoms can be managed when she sees a psychiatrist on a regular basis for medication management." (Tr. at 20.) Finally, the ALJ placed "great weight" on the opinion of state agency psychological consultant Richard H. Cyr-McMillon, Ph.D., who also found that Plaintiff had moderate limitations in concentration, persistence, and pace and step three, but nevertheless concluded that she could perform simple tasks and function adequately in a stable environment. (Tr. at 22.) As noted by the ALJ, Dr. Cyr-McMillon posited that Plaintiff "may have some difficulty adapting to changes in the workplace but can avoid hazards and should be able to adapt to changes associated with the performance of simple tasks and function adequately in a stable work assignment in a position that is not highly production oriented or socially demanding." (Tr. at 22, 82.) The ALJ then incorporated these various limitations in the RFC, by limiting Plaintiff to simple, routine, repetitive tasks, and also limiting her to only occasional decision-making and only occasional changes in the work setting.

In Mascio, the Fourth Circuit explained that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). However, in this case, as explained above, the ALJ considered Plaintiff's mental limitations at length and set out the reasons for the RFC determination, ultimately relying on Plaintiff's activities of daily living, mental health treatment records, and the opinion of Dr. Cyr-McMillon

in setting Plaintiff's RFC with respect to her mental limitations. Thus, sufficient explanation is provided to allow for meaningful judicial review, and the ALJ's determination is supported by substantial evidence.

### 2.    Social Functioning

Plaintiff also contends under Mascio that her moderate limitations in social functioning were not adequately reflected in the RFC. In this regard, at step three of the sequential analysis, the ALJ found that Plaintiff had moderate difficulties in social functioning. (Tr. at 18.) In making that determination, the ALJ noted that Plaintiff testified that "she avoids social invitations because she does not like crowds or social pressure to make new friends." (Tr. at 18.) However, the ALJ further found noted that "Dr. Cyr-McMillon, a psychological consultant, opined that [Plaintiff] retained sufficient social functioning to work in an environment that is not socially demanding." (Tr. at 18.)

In setting the RFC, the ALJ limited Plaintiff to only occasional interaction with the public on an occasional basis and only occasional interaction with coworkers, but found that Plaintiff could respond appropriately to supervision. (Tr. at 19.) In making this determination, the ALJ noted that Plaintiff's "statements about significant difficulties with interpersonal relations is contradicted by her husband's third party function report, where he indicated that she does not have problems getting along with family, friends, neighbors, or others. (Tr. at 20, 181-182.) That report specifically notes that Plaintiff gets along "well" with authority figures such as bosses. (Tr. at 182.)

In addition, in considering the opinion evidence, the ALJ discounted the opinion evidence from Ms. Murray, a clinical social worker, to the extent she rated Plaintiff as having

marked limitation in her ability to interact appropriately with coworkers. (Tr. at 21, 757.) The ALJ gave great weight to the opinion of Dr. Cyr-McMillon, who found that Plaintiff had moderate limitations in social functioning, but that she can "relate appropriately to supervisors" and follow simple instructions in a setting that is "task versus public oriented." (Tr. at 82.) The ALJ then set the RFC, finding that "[d]ue to her psychological symptoms, [Plaintiff] can only interact with the public on an occasional basis. She can occasionally interact with coworkers, but not work in tandem with them. She can respond appropriately to supervision. She can perform simple, routine, and repetitive tasks. She can tolerate only occasional decision-making. She can tolerate only occasional changes in the work setting." (Tr. at 19).[5] Thus, the ALJ considered Plaintiff's social functioning at length and specifically including social limitations in the RFC, providing sufficient explanation to allow for meaningful judicial review, and supported by substantial evidence.

### 3. Activities of Daily Living

Plaintiff also contends under Mascio that her mild limitations in activities of daily living were not adequately reflected in the RFC. However, these contentions are equally unpersuasive.

> With regard to the mild limitations in activities of daily living . . . some district courts within the Fourth Circuit have extended the holding in Mascio to require an ALJ to either include restrictions in the RFC arising out of those mild limitations or justify the omission of such restrictions. See, e.g., Ashcraft v. Colvin, No. 3:13CV00417RLVDCK, 2015 WL 9304561, at *9 (W.D.N.C. Dec. 21, 2015) (unpublished) ("[S]ince Mascio was decided, the majority of other

---

[5] In addition, the Court notes that the restriction to only occasional interaction with coworkers and the public is not ambiguous or unclear. Consistent with the DOT definitions, this restriction limited Plaintiff to interaction with coworkers and the public up to 1/3 of the day, and the vocational expert understood this limitation and provided job titles from the DOT consistent with this limitation. See O'Brien v. Colvin, Case No. 1:15CV536, 2016 WL 2755459 at *5 (M.D.N.C. May 11, 2016). No one present at the hearing noted any concern with understanding the limitations provided by the ALJ, and there is no reason to remand this case in this regard.

courts in North Carolina have similarly found that, where an ALJ determines that a claimant suffers from 'mild' or 'moderate' limitations in his or her activities of daily living, social functioning, and ability to maintain [CPP] and such limitations are unaccounted for in the RFC, or their absence is unexplained in the analysis surrounding the ALJ's RFC determination, remand is required." (emphasis added)); Reinhardt v. Colvin, No. 3:14–CV–00488–MOC, 2015 WL 1756480, at *3 (W.D.N.C. Apr. 17, 2015) (unpublished) ("While the court agrees with the Commissioner's argument that the fact that the ALJ found mild limitations in the paragraph B criteria does not necessarily translate to a work-related functional limitation, Mascio clearly imposes on the Commissioner a duty to explain why such mild mental health impairments found at step two do not translate into work-related limitations when [the] plaintiff's RFC for work is considered.").

Adams v. Colvin, No. 1:15CV00673, 2016 WL 4007608, at *7 (M.D.N.C. July 26, 2016). In this case, as in Adams, "[a]ssuming that Mascio applies even in the context of mild limitations in the broad areas of functioning (i.e., the lowest of four levels above 'none'), the ALJ here sufficiently explained why Plaintiff's mild limitations in daily activities . . . did not translate into further restrictions in the RFC." Id. at *7.

With respect to Plaintiff's activities of daily living, at step three the ALJ found mild restrictions, based on Plaintiff's testimony that "she has difficulty performing manipulative tasks, such as sewing and peeling potatoes, but she attributed the limitation to her physical impairments." (Tr. at 18.) To the extent Plaintiff now contends that the RFC failed to account for this step three determination, the Court notes that Plaintiff has failed to point to any other mental RFC limitations that should have been included in connection with her mild limitations in activities of daily living. Moreover, in setting the RFC, the ALJ did address Plaintiff's mild limitations in activities of daily living. Specifically, the ALJ noted that Plaintiff shops at the grocery store and cares for her twelve-year-old adopted daughter (Tr. at 20), she takes care of her husband and daughter by cooking and doing laundry, she drives, and she handles financial

matters. (Tr. at 21.) The ALJ also gave great weight to State agency consultant Dr. Cyr-McMillon's opinion that Plaintiff had mild restrictions in activities of daily living but could still understand and perform simple tasks and could "adapt to changes associated with the performance of simple tasks and function adequately in a stable work assignment." (Tr. at 22, 81.) Again, this discussion provides a sufficient explanation for the omission of any other limitations from the RFC related to activities of daily living.

B. Treating Physician Opinion

Plaintiff next disputes the ALJ's weighing of the opinion evidence. Plaintiff specifically challenges the ALJ's application of 20 C.F.R. § 404.1527(c)(2), better known as the "treating physician rule." The Fourth Circuit has held that for claims, like Plaintiff's, filed before March 24, 2017, ALJs must evaluate medical opinion evidence in accordance with 20 C.F.R. § 404.1527(c) and the "treating physician rule" embodied within the regulations. Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). Under these regulations, "medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)). While the regulations mandate that the ALJ evaluate each medical opinion presented to him, generally "more weight is given to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)). The ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of

a treating source as to the nature and severity of a claimant's impairment, based on the ability

of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)
> [which] may bring a unique perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or from reports of individual
> examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by

medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other

substantial evidence in the case record," it is not entitled to controlling weight. Social Security

Ruling 96-2p, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to

Treating Source Medical Opinions, 1996 WL 374188, at *5 (July 2, 1996) ("SSR"); 20 C.F.R. §

404.1527(c)(2); see also Brown, 873 F.3d at 255; Craig, 76 F.3d at 590; Mastro, 270 F.3d at

178.[6] Instead, the opinion must be evaluated and weighed using all of the factors provided in

20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2)

the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the

supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether

the source is a specialist, and (7) any other factors that may support or contradict the opinion.

Moreover, even if an opinion by a treating physician is given controlling weight with respect

to the nature and severity of a claimant's impairments, opinions by physicians regarding the

ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never

---

[6] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social
Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social
Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to
any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."
20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court
has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

Where an ALJ declines to give controlling weight to a treating source opinion, he must "give good reasons in [his] . . . decision for the weight" assigned, taking the above factors into account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted).

In the present case, the ALJ gave little weight to the opinion of Plaintiff's treating physician Dr. Feraru with regard to Plaintiff's physical limitations. As noted by the ALJ, Dr. Feraru provided the following opinion:

> She is unable to perform gainful employment due to the pain. She can't sit/stand or walk very long, can't bend or lift more than 5 lbs. She has problems concentrating due to pain.

(Tr. at 21, 761.) The ALJ gave three reasons for assigning this opinion little weight. First, "Dr. Feraru failed to give the basis for the opinion." (Tr. at 21.) In this regard, Plaintiff testified that Dr. Feraru did not perform any type of functional evaluation (Tr. at 40), and there is nothing in Dr. Feraru's opinion reflecting the basis for the limitations set out there. Second, the ALJ found that Dr. Feraru's opinion was "not supported by [Dr. Feraru's] treatment notes." (Tr. at 21.) In this regard, the ALJ set out Dr. Feraru's treatment notes throughout the opinion. The ALJ first noted that Plaintiff visited Dr. Feraru on June 18, 2012, just prior to the alleged onset date, for an evaluation of the pain in her lower back and left hip, and "reported that Prednisone had improved her condition and that her pain was better after using a Dosepak." (Tr. at 15.) This treatment record specifically reflects that "the Prednisone

helped her a lot" and that her low back pain was better with "some discomfort" remaining. (Tr. at 265.) Her motor function, sensation, reflexes, and gait were all normal, with a negative straight leg raise test. (Tr. at 267.) This June 2012 record also includes a report of Plaintiff's 2010 lumbar MRI, which reflected facet joint arthropathy and degenerative disc disease but no definite nerve root impingement. (Tr. at 15, 266, 609.) The ALJ also described a treatment record from May 2014, near the time of Dr. Feraru's opinion, when Plaintiff visited Dr. Feraru for an evaluation of her neck pain and to review the results of a recent MRI. (Tr. at 16, 561-64.) As noted by the ALJ, "Dr. Feraru noted [Plaintiff's] neck and right-arm pain had improved with prednisone. The MRI showed disc bulges at multiple levels of the cervical spine, but no root compression. Of the physical examination, Dr. Feraru noted that [Plaintiff's] strength in all five motor groups was a 5/5." (Tr. at 16, 561-64, 603.) The treatment records reflect that Plaintiff's neck pain had increased over a few days in April 2014 (Tr. at 574), but had improved by the next visit a month later in May 2014 and she "overall feels better," with normal strength, reflexes, sensation, and gait. (Tr. at 561-64.) The ALJ also noted that Plaintiff visited Dr. Feraru in January 2013, noting that Plaintiff's headaches were infrequent. (Tr. at 16.) At that visit, Plaintiff was following up regarding her back pain, and was "doing better with meds," with normal strength, sensation, reflexes and gait. (Tr. at 512-15.) The ALJ then set out the following evaluation of Dr. Ferarus's treatment records:

> [Plaintiff's] allegation of serious back pain is not consistent with the medical evidence. While an MRI study documents the existence of degenerative disc disease, the clinical evidence does not show that the disease rises to the level of a disability. For example, Dr. Feraru examined [Plaintiff] in May 2014 and found that her motor strength in all five groups was 5/5, that her cerebellar and gait were without ataxia, and that her straight-leg raise was bilaterally negative.

> Additionally, treatment for [Plaintiff's] back pain has been confined to conservative therapies such as Prednisone and Icy Hot, and Dr. Feraru's treatment notes indicate that her condition improved with Prednisone.
>
> [Plaintiff's] allegation of disabling neck pain is inconsistent with the medical evidence. The medical evidence shows that her cervical disc pain can be managed with injections and Prednisone. It also shows that her allegation of serious exertional limitations is inconsistent with Dr. Feraru's clinical findings. As previously mentioned, the physical examination in May 2014 demonstrated that [Plaintiff's] strength in all five motor groups was 5/5.

(Tr. at 20.)[7] Third, in giving Dr. Feraru's opinion little weight, the ALJ found that the opinion is not supported by "other objective medical evidence." (Tr. at 21.) That medical evidence is included in the above summary, including the MRI results reflecting facet joint arthropathy and degenerative disc disease in the lumbar spine but no definite nerve root impingement, (Tr. at 15, 266, 609), and disc bulges in the cervical spine, but no root compression (Tr. at 16, 561-64, 603). In addition, Plaintiff's annual physical examination at Bethany Medical Center in April 2014, only a few days before the date of Dr. Feraru's opinion, reflects that Plaintiff "feels well with minor complaints." (Tr. at 643.) At that annual physical, the review of musculoskeletal system reflects that "Back Pain, Joint Pain, . . . Muscle Weakness and Myalgia" were "Not Present," and that physical "examination of the lumbrosacral spine reveals – no tenderness to palpation, no pain, no swelling, edema or erythema of surrounding tissue and normal lumbosacral spine movements." (Tr. at 644-45.) Similarly, Plaintiff's neck had a "full

---

[7] In addition, the ALJ noted that in the third-party function report, Plaintiff's husband stated that Plaintiff:

> [c]ares for him and the adopted daughter by cooking and doing laundry. He specified that she spends thirty minutes preparing dinner five times a week, and that her cooking practices have not changed since the onset of her illness. He stated that she does not require encouragement to perform these tasks. He stated that she is able to drive and go out alone. He stated that she spends two hours in stores shopping for groceries every week.

(Tr. at 21.)

range of motion" and was "non-tender." (Tr. at 645.) She had normal muscle strength, normal bulk, contour and tone, and normal gait and station. (Tr. at 645.) These findings are similar to the prior annual physical examination in January 2013 (Tr. at 686-87), as well as the later records from July 2014 (Tr. at 766-68). Thus, the ALJ provided sufficient explanation for the weight given to Dr. Feraru's opinion, supported by substantial evidence in the record.[8]

Plaintiff also challenges the ALJ's weighing of some of the other opinion evidence, although none of the other opinions are from treating physicians under the treating physician rule. First, Plaintiff challenges the ALJ's decision to give "partial weight" to the opinion of the consultative examiner Dr. Troxler. As noted by the ALJ, Dr. Troxler opined that Plaintiff "could perform simple tasks at a reduced rate of efficiency, that she would have difficulty interacting appropriately with others at work, and that she would have difficulty tolerating the stress of full-time employment." (Tr. at 16.) As to that opinion, the ALJ gave the opinion only partial weight. First, the ALJ noted that it was "based on a one-time examination." (Tr. at 21.) In that regard, it is undisputed that Dr. Troxler saw Plaintiff only once, and Dr. Troxler's report does not reflect that she reviewed Plaintiff's records or had access to any other information to provide a broader view. Second, the ALJ found that Dr. Troxler's opinion was "not fully consistent with the claimant's ongoing treatment notes." (Tr. at 21.) The ALJ noted, for example, that treatment notes reflect that Plaintiff's "psychological symptoms can be managed when she sees a psychiatrist on a regular basis for medication management." (Tr.

---

[8] In addition, as noted by Defendant, to the extent Dr. Feraru opined on the ultimate question of whether Plaintiff was disabled or could perform gainful employment, those are issues reserved to the Commissioner.

at 20, 253.)  The ALJ also noted that according to Plaintiff's husband, Plaintiff "does not have problems getting along with family, friends, neighbors, or others."  (Tr. at 20.)

Similarly, Plaintiff challenges the ALJ's decision to give little weight to a May 11, 2010 opinion from a Licensed Psychological Associate, Suzanne Ramsey, who opined that Plaintiff "can barely use her hands; she cannot sit for long or stand for long; she is reactive and gets upset easily.  Her irritability and frustration is often played out with others and her people skills are sketchy."  (Tr. at 21, 525.)  The ALJ gave this opinion little weight first because it was "not supported by clinical findings." (Tr. at 21.)  In that regard, there are no supporting records from Ms. Ramsay and no clinical findings made to support the assertions.  Second, the ALJ also found that the assessment of Plaintiff's physical limitations was entitled to little weight because it was "outside of the scope of treatment for a mental health therapist."  (Tr. at 21.)  In this regard, it is undisputed that Ms. Ramsey was a mental health therapist, and she gives no basis for her evaluation of Plaintiff's physical condition and no expertise for opining with respect to Plaintiff's physical limitations.

Finally, Plaintiff challenges the ALJ's decision to give partial weight to an assessment by Ms. Murray, a clinical social worker, in August 2014.  (Tr. at 21, 756-58.)  Ms. Murry opined that Plaintiff had moderate limitations is some areas of functioning, and marked limitations in her ability to interact appropriately with co-workers.  The ALJ gave partial weight to the opinion with regard to the moderate limitations because the opinion was "somewhat consistent with the treatment record," and the ALJ took those moderate limitations into account in setting the RFC as discussed above with regard to the mental RFC.  However, the ALJ discounted Ms. Murray's opinion that Plaintiff had marked limitations in her ability to

interact appropriately with coworkers. The ALJ noted first that this opinion was not consistent with the objective treatment notes. Notably, nothing in Plaintiff's therapy notes with Ms. Murray reflect an inability to get along with co-workers, and instead those treatment notes reflect that Plaintiff was focused on particular concerns regarding her daughter's behavior and her mother's health. In addition, the ALJ found that Ms. Murray's assessment was "based on [Plaintiff's] report of past work situations rather than her own independent judgment." (Tr. at 21.) In this regard, Ms. Murray's form specifically asked her to identify the factors that supported her assessment. With respect to social functioning, including the marked limitation in interacting with co-workers, Ms. Murray stated that her assessment was based on "Cindy's report of past work situations. I assume these issues remain if she was working now." (Tr. at 757.) Thus, Ms. Murray herself stated that the only basis for her assessment was Plaintiff's "report of past work situations" that Ms. Murray "assumed" would remain, and the ALJ discounted her opinion on that basis.

Thus, as to all of the opinion evidence, the ALJ explained the weight being given and the reasons for assigning more or less weight. Those determinations are supported by substantial evidence in the record, cited and relied upon by the ALJ. To the extent that Plaintiff essentially asks the Court to re-weigh the evidence and come to a different conclusion than the ALJ, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion,

or even "whether [the claimant] is disabled," but rather, "whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained her decision, and supported that explanation with substantial evidence. Accordingly, the Court finds no basis for remand.

C.     DOT Conflict

Finally, Plaintiff challenges the ALJ's determination at step four and step five. Plaintiff first contends that the ALJ failed to properly identify Plaintiff's prior work at step four of the sequential analysis. On this issue, Plaintiff notes that Plaintiff's past work was a composite job of forklift driver and office helper, and the ALJ concluded only that she could do her past work of office helper. However, even if this was error at step four, the ALJ made an alternative step five finding, concluding that even if Plaintiff could not return to her past work, there were other jobs in the national economy that she could perform. Thus, any error at step four was rendered harmless by the alternative finding at step five.

Plaintiff challenges the ALJ's determination at step five, based on alleged conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles. In Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit clarified the steps an ALJ must take to identify and resolve apparent conflicts between a vocational expert's testimony and the DOT. Specifically, the Fourth Circuit held that, if an expert's testimony apparently conflicts with the DOT, the expert's testimony can only provide substantial evidence to support the ALJ's decision if the ALJ received an explanation from the expert explaining the conflict and determined both that the explanation was reasonable and that it provided a basis

for relying on the expert's testimony rather than the DOT.  Pearson, 810 F.3d at 209-10; see also Rholetter v. Colvin, 639 F. App'x 935, 938 (4th Cir. 2016).

In the instant case, Plaintiff contends that the vocational testimony on which the ALJ relied at step five of the sequential analysis conflicted with the DOT.  In particular, Plaintiff challenges the vocational expert's testimony that the jobs he identified could accommodate alternating between sitting and standing.  However, the vocational expert addressed this issue and said:

> let me initiate my testimony by telling the Court that related to the part of the hypothetical related to the sit-stand option that the DOT does not specifically reference that factor.  When I testify with regard, I use professional association as a resource.

(Tr. at 53.)  Given this testimony, the ALJ then specifically addressed the issue in her decision by noting the potential conflict particularly as to the sit/stand option, and finding that

> [a]lthough the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles, there is a reasonable explanation for the discrepancy.  The vocational expert's testimony about the availab[ility] of a sit-stand option was based on his education, training, professional knowledge, and experience.  The [ALJ] accepts the vocational exper[t's] testimony.

(Tr. at 23.)  Thus, the issue was identified and the ALJ received testimony from the Vocational Expert explaining the potential conflict.  The ALJ then explicitly determined both that the explanation was reasonable and that it provided a basis for relying on the expert's testimony rather than the DOT.  Plaintiff now argues that, because the expert did not testify that he relied on his "education, training, professional knowledge, and experience," but rather his "professional association as a resource," the ALJ's reliance on his explanation was unsupported.  However, in the context presented, the ALJ's understanding of that testimony

is reasonable.[9]   The apparent conflict was thus addressed and resolved to the extent required by <u>Pearson</u>, and the Vocational Expert's testimony provides substantial evidence supporting the ALJ's conclusion.

Plaintiff further contends that two of the step five jobs, namely parts cleaner and mail sorter, include apparent conflicts with no explanation.  Specifically, Plaintiff contends that the job of parts cleaner requires constant handling, directly contradicting the limitation to frequent handling included in the RFC.  (Pl.'s Br. [Doc. #10] at 18).  Defendant acknowledges this error, but argues that it is harmless in light of the additional jobs identified by the vocational expert.  (Def.'s Br. [Doc. #13] at 19.)  Plaintiff also contends that the reasoning level of three required for a mail sorter exceeds her mental RFC limitation to simple, routine, repetitive tasks.[10]  (Pl.'s Br. at 18-19.)  However, as with the prior contentions, any such error is harmless, because even if the challenged jobs of parts cleaner and mail sorter are disregarded, the ALJ still found other jobs that exist in the national economy (specifically, 140,000 positions as a

---

[9] The vocational expert's resume, included in the record, reflects that he has a Master's Degree in Rehabilitation Counseling, and from 2009-2012, shortly before the hearing, he was on the National Board of the American Board of Vocational Experts.  (Tr. at 141.)  In this context, his reference to his "professional association" could reasonably be construed as including his background and experience in that field.

[10] Previous cases in this Circuit have found an apparent conflict between jobs requiring a Reasoning Level of 3 and a claimant's limitation to jobs involving only simple, routine, repetitive tasks.  <u>See, e.g.</u>, <u>Mullis v. Colvin</u>, No. 1:11CV22, 2014 WL 2257188 (M.D.N.C. May 29, 2014) (Osteen, C.J.) (finding an apparent conflict between an RFC limitation to simple, routine, repetitive tasks at a low production pace and low stress environment and a VE's testimony that Plaintiff could perform a job to which the DOT assigned a Reasoning Level of 3); <u>see also</u> <u>Henderson v. Colvin</u>, 643 F. App'x. 273, 277 (4th Cir. April 5, 2016) (holding that "there is an apparent conflict between an RFC that limits [the claimant] to one-to-two step instructions and GED Reasoning Code 2, which requires the ability to understand detailed instructions," and "the VE's conclusory statement that a conflict did not exist was insufficient").

retail marker), that Plaintiff would be able to perform, based on the remaining representative position and the testimony of the vocational expert.[11]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #9] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #12] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 10th day of September, 2018.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[11] The Vocational Expert also noted that Plaintiff could perform the position of Office Helper as defined in the DOT, with 125,000 jobs in the national economy (Tr. at 54), providing additional representative positions at step five even if not considered as past work at step four.